Good morning, your honors. It may have pleased the court. Jeremy Kaufman on behalf of the petitioner, Demila Suarez Rodriguez. I'd like to reserve two minutes of time for rebuttal. Our brief explains why substantial evidence compels the conclusion that Demila suffered past persecution. But I want to make something very clear. This court doesn't need to reach that issue because there are two key errors in the board's analysis that independently require granting the petition and remanding for further proceedings. The first key error is that the board refused to consider Demila's firing and subsequent blacklisting as part of the events constituting persecution. And the board did that because it concluded that these events were not on account of her political opinion. That determination is not supported by substantial evidence. The key event here in the firing is, the key event here is Demila being fired from a social work program that she was required to complete in order to validate her degree and obtain future employment. It's clear from the record that this dangerous trip to Venezuela was a pretext for firing her. First, Demila testified that her supervisor had assigned her this mission with a double meaning and that she did so because the boss never liked Demila. But is the firing persecution? It's unfortunate, but is it persecution? I think on its own, the firing may or may not rise to the level of persecution. I think under this court's precedent, most likely it wouldn't be. You'd have to look at the sort of larger pattern of economic persecution. But one thing that's crystal clear from this court's case is that prolonged and targeted economic harassment or discrimination can rise to the level of persecution. And so I think what the board needed to do is it needed to consider the firing, the subsequent blacklisting and inability to get a job, and then consider how did that affect Demila's ability to live in Cuba. And in considering all of that together with all of these other events of persecution. Right, but I mean the board obviously was focused more on Nexus, I guess on this part of her claim. And so why is that lacking in substantial evidence? So I think, yeah, so the board didn't address the Nexus element more broadly. It only addressed the Nexus element as to this particular event. Well, that depends, I guess, how you read the board decision. But I think you're right that the board's Nexus analysis at least was more focused when it came to the firing. Yes, Your Honor, I think that's right. So for the other instances of harassment and the board looks at the Nexus analysis. But the reason why the Nexus analysis here is without substantial evidence is because everything in the record on this point confirms that she was asked to go on a dangerous mission as a pretext for firing her. What were her political beliefs? I mean, that's sort of the oddity of this is that we're saying, well, is it the Nexus was the protected ground, the protected ground was political beliefs, but it's not clear to me what her beliefs even are. So there's two places really where she's sort of expressed her political beliefs. First is when she refused to participate in pro-government rallies. And in her declaration, she explains this is the reason why her boss sort of always, you know, didn't like her and was always looking for an excuse to fire her. And of course, in Cuba, not participating in a pro-government rally is sort of the equivalent of more affirmative opposition. So her political belief is anti-government, an anti-government belief or? I think, I think the best way to analyze this usually, I mean, I'm just not sorry to cut you off there. I mean, usually you see these claims and the political belief is my association, my affiliation with this political party, this political organization. She doesn't seem to have that. Yes. And I think that's correct, Your Honor. Although this court has made very clear that imputed political beliefs can, or an imputed political opinion is sufficient to satisfy that element of asylum claim. And so I think that's sort of the best way to analyze this case is that given that she refused to participate in pro-government rallies that sort of everybody else was participating in or expected to participate in, and given her association with her grandmother who lived in the house with them when she was growing up and who was, you know, obviously a notorious political dissident, I think together that makes clear that there was an imputed political opinion. Well, what about this issue that came up in the 28Js on the credibility? Do you want to speak to that? Yeah. I don't think that the, I don't think Ming Dai changes the analysis at all. I think Ming Dai just sort of clarifies what, what might've always been obvious, which is if an applicant receives a credible, favorable credibility determination, this court should take the testimony as true and accept those as facts. But of course it can't do so if there's contrary record evidence, because then it has to sort of weigh the, the credible testimony against contrary facts in the record. And so it's sort of like you're taking it as true to, to, to a limit, right? Until there's something to suggest that it's not true. And I think here our issue is that's not this case. There's nothing in the record that undermines Demila's telling of the story, which is that her boss didn't like her. She didn't like her because she wasn't going on these pro-government events. And because she didn't like her, she wanted to fire her and ultimately found the pretext for doing so through assigning her this dangerous Venezuelan mission. Do you want to speak to these due process issues that you've discussed in the briefs? Yes, your honor. So I think, um, there's sort of two key due process violations here. The first is that the IJ didn't explain the elements of the claim of, of Demila's asylum claim. And the second is that the IJ failed to adequately probe the record as this court's precedents required it to do so. And so on, on that last point, I just want to emphasize the entire substantive questioning that goes to the elements of Demila's claims is a mere 19 double-spaced pages. And as this court is familiar with, with the many immigration cases, um, that, that's a pretty tight, uh, transcript for an immigration hearing. This is on the, on the first claim? On the, on the first aspect of your argument? In terms of not, not explaining to her the, the elements of the claim? Um, Is that what you're referring, when you say there's 19 lines of discussion, which part of your due process claim are you talking about? I'm sorry, your honor. Yes. So this is, this is with respect to the IJ's failure to adequately develop the record. I see. I thought, I mean, there were a lot of open-ended questions on this. I mean, it's, it seems like the IJ allowed a sort of sufficient ventilation. If she had something to say, she had the opportunity to put it out there, no? Um, I would disagree with that, your honor. I think the record reflects that the IJ asked predominantly closed or at least very narrow questions. But I think more fundamentally here for the due process claim is that when Demila started to testify about more severe instances of persecution, in particular, the constant police searches of her home, the immigration judge consistently moved her off of the subject and onto a sort of less severe line of testimony. And then use the fact that, oh, well, the police searches seem kind of fine. And then, you know, these, these other things like childhood abuse don't rise to the level of persecution. But the reason why that was the record that the IJ was dealing with is because every time Demila tried to get into these police searches and, and add color to them, the immigration judge ushered her off of the subject. So at AR 152 to 153, she testifies that the police were constantly coming to the home and searching it and that she thought they were doing so to unbalance the family psychologically and mentally. At 153 to 154, she explains that the visits to her home had started increasing. No follow-up here from the immigration judge. And at AR 155, Demila again starts testifying for the third time now, trying to explain the nature, scope, extent of the police searches of the home. And the IJ again pushes her off the subject by asking her about how she could live in Cuba if no one was working. And so every time she's trying to get this story out, the IJ is moving her away from it. And there were, there were natural follow-up questions to Demila's testimony that could have easily painted a very different and grimmer picture of these police searches, which might have changed the immigration judge's sort of casual dismissal of, of that in analyzing whether it rose to the level of persecution. I know your time's running out. I'll give you an extra minute for rebuttal. But can you address future persecution? What's in the record about what treatment she may face if she were to return to Cuba? I think the two, three, yeah, there's two key things in the record for what harm she'll face. The first is the country conditions reports that the government submitted. That's at AR 413. That makes clear that both failed asylum seekers and people who have been gone for more than two years are sort of independently viewed suspiciously and are at heightened risk. And here Demila's both. She's now been gone for more than two years and she's a failed asylum seeker. Does it specify what specifically, what treatment such people may face? Not in great detail. It says that if a failed asylum seeker, if the government learns that somebody is a failed asylum seeker, they will be subject to like heightened surveillance. And then I think if you've been gone for more than two years, there's a chance that they don't even let you in. But it's a little bit more general. It's like if you've been gone for more than two years, you're considered a traitor. You lose your rights as a Cuban. Stuff like that. What record evidence, may I? What record evidence would compel the conclusion that she would be likely to face persecution in the future? I mean, I'm just struggling to see what in the record would demonstrate that. Yes, Your Honor. I see that my time is almost out. So if I could finish the question. Yes. Okay, thank you. So there's a few things. First is the country condition reports that make clear that a refugee that's in her position is more likely to face increased harm if returned. The second thing is, even if she just has a repeat of her past experiences, and it's the same thing that she was going through when she was in Cuba the first time, the effect of those experiences are going to be particularly acute now. Because Demila no longer has her mother in Cuba, and she no longer has a house to live in. So she's now going to be facing economic, a similar type of economic blacklisting, but she's going to have no house and she's going to have no family support financially. And that all goes to whether or not the events rise to the level of persecution. And then, finally, I'd just like to add, too, that another key piece of her future persecution claim was never reduced, in part because the IJ failed to fulfill her duties to develop the record adequately. And that's the fact that Cuban officials had gone to the neighbor's house asking where Demila was, threatening them with arrest if they didn't tell her. And all of that shows that the Cuban government has a continued interest in Demila. Thank you, Mr. Kaufman. Thank you, Your Honors. May it please the Court, Victor Lawrence on behalf of the Attorney General. This Court should deny this petition for review as substantial evidence in the record supports the agency's determination that Suarez did not meet her burden of proof on asylum by proving or showing that she demonstrated that she was persecuted in the past or that she has a well-founded fear of persecution in the future. Furthermore, the government asserts that the proceedings before the immigration judge were – they have not shown in any way that they were fundamentally unfair. And even so, if they had done that, they have not shown that she was prejudiced in any manner by the immigration judge's conduct in the proceedings. You wanted to start there because Mr. Kaufman made the point that, in his view, when you look at the transcript, she was trying to get some things out and she was sort of misdirected, redirected by the IJA. What do you think about that? Sure. So if we were to sit here and try to determine whether we could have had better follow-up questions on particular questions that the immigration judge asked, I'm sure we could have all thought of better follow-up questions at certain times in the proceedings. But that's not the Court's duty here. The Court's duty here is to determine whether or not, from the context of the entire proceeding, the immigration judge was fair or certainly was not fundamentally unfair. And yes, you're always going to see a point in proceedings where an immigration judge may have asked a better question or may have followed up in a better manner. But again, there's no due process violation here. And Ms. Suarez had plenty of opportunity to bring up this claim, particularly at the end. The immigration judge asked if there was anything more she wanted to add. And of course, if this issue was something that she was trying to get off her chest about the government searches, she could have added it there. But she could have added it in the context of any number of the questions that the immigration judge asked. But there's nothing showing that what she would have said more about these searches other than this idea that the police officers may have issued some threats at the time. Very vague term threats. We're not sure about what. We're not sure whether those even would rise to the level of persecution. Are the threats that are in the record, did those rise to the level of persecution? I don't think. Which threats? Or at least did the police coming to the house? No. Our position is that this did not show past persecution. We're looking at everything and the immigration judge and the board looked at everything through the lens of a child and in the aggregate. And looking at the idea that there were some instances where police came to the house to do some searches, this idea that she was ostracized in school, derogatory comments by the teachers. You know, this court has ruled on many occasions that persecution is an extreme concept. It's much more, it's considerably more than harassment or discrimination. And we, you know, here we have a case in which Ms. Suarez was never physically harmed. Her mother was never physically harmed. Her sister was never physically harmed. None of them were ever accosted by the police or brought in for questioning. So all we're talking about is the searches, some social ostracism in school, and some derogatory comments by teacher. All regrettable, all behavior none of us wish to experience, but none of which rises, excuse me, to the level of persecution, as this court has indicated in many cases, including Sharma versus Garland. How should we address the claim of future persecution? The country conditions report says that those who have left Cuba for over two years are considered traitors if they try to return. When the IJ and BIA decided this matter, she had only been gone for about a year and the BIA says we're not going to consider that. Now it's been over two years. So how should we address that? Sure. So as one of your others indicated before, there's nothing to indicate that, first, that there was, she would be subject to persecution if she were to return to Cuba. The fact that she might have some problems as somebody who returns after two years is not, there's no indication in the record that that would be persecution, rise to the level of persecution. Second, what we have here potentially is a situation of changed circumstances where the petitioner, Ms. Swartz, has the opportunity to file a motion to reopen with the board to suggest that there are changed circumstances now. Hey, look, look at this evidence at page 413 of the record, which shows that after two years we may encounter some additional difficulties. So she had the opportunity to file a motion to reopen, still can, with the board to suggest there are changed circumstances now that boosts her ability or changes her claim for a well-founded fear of future persecution. But she hasn't taken that administrative step and therefore this court should not rule based on that with respect to a well-founded fear of future persecution because she has not exhausted her administrative remedy, at least with respect to this issue of what happens after two years. Would the government oppose a motion to reopen in this case, number one? And number two, how likely does the government think that it would be granted and seriously considered? Okay, so a couple things there, Your Honor. With respect to a motion to reopen, that would be a call that the Department of Homeland Security would have to make. I do represent them in this matter. I represent their Attorney General. So I don't know whether or not they would agree to a motion to reopen. But again, the motion to reopen would have to show that there are changed circumstances that now make her asylum claim different such that she has a chance now of establishing that she deserves asylum, that she can meet her burden of proof. So if all she does is come back to court with page 413 of the record and say, hey, look, now it's been more than two years, therefore my claim is different, I'm not sure that the case, again, as the Court's pointed out earlier with respect to my opponent's presentation, there's nothing in the record to show that after two years she will suffer from persecution. She may have some additional problems. So generally speaking, I don't think the record shows that there's anything where she can make a claim of past persecution. It just doesn't rise to the level. With respect to well-founded fear, again, it's something that they had the opportunity to file a motion to reopen if there were changed circumstances. But based on the other things, there are a lot of things not in the record. They talk about how she has a newborn child now, how she might not have a home when she goes back there. These things are just not established in the record that these are items that will actually put her in a position where she has an objective fear of persecution as a result of any of those things. On the due process claim, we feel that this argument about 19 pages, if a claim only has a few allegations in it, there's no page limit or there's no requirement that an immigration judge question somebody for more than 19 pages. It's just kind of an argument that doesn't really carry any weight in our opinion. But we do think that the immigration judge asked open-ended questions. I point out many of them at page 40 in my brief, in the respondent's brief, where the immigration judge gave plenty of opportunity for the Ms. Suarez to provide additional color on her claim, and she did not do so, and I don't think that the immigration judge made any error with respect to explaining her claim, explaining what she needed to do, or with respect to the questioning that she had for this particular applicant. If there are no further questions, I would just ask that the court deny this petition for review as substantial evidence supports the agency's claim, and the court should further find that there's no due process violation here. There's certainly nothing fundamentally unfair in the questioning, and there's nothing that shows any prejudice that Ms. Suarez – such that the court's opinions, for instance, in Zamorano and other opinions say you have to show that if you were prejudiced that the court did something that materially affected the outcome of the proceedings, and we don't believe they've made that showing here. So we would ask that the court deny this petition for review. Thank you. Thank you. So just to briefly respond to those, the government focused heavily on whether substantial evidence compels the conclusion on the record as a whole, mostly looking at the events of persecution or oppression or harassment that the board looked at. But as I mentioned at the outset, this court doesn't need to reach that question because there's two predicate errors that the board committed that independently require reversal. One is the board's error on substantial – whether there was a nexus between the economic harassment and Damila's political opinion, or imputed political opinion. And the second was the board's failure to account for the disappearance of Damila's grandmother in analyzing the events that constituted persecution of Damila herself. And so regardless of whether this court thinks that putting all of the facts together, you still don't compel a conclusion of persecution, our position would be that it's for the board to make that decision in the first place, given the errors. Yeah. So I see my time is up, and I will leave it at that. Thank you both for the helpful argument. The case has been submitted.
judges: LEE, BRESS, Fitzwater